IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEANETTE OTT, | : | |
| | : | |
| Plaintiff | : | Case No. 4:04-CV-763 |
| | : | |
| v. | : | (Judge Jones) |
| | : | |
| LITTON INDUSTRIES, INC., sponsor | : | |
| and administrator of the LITTON | : | |
| INDUSTRIES, INC. EMPLOYEES' | : | |
| HEALTH/LONG-TERM DISABILITY | : | |
| PLAN ET AL., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM AND ORDER

### May 20, 2005

### THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Pending before the Court is a Motion for Summary Judgment (doc. 19) filed by Plaintiff Jeanette Ott ("Plaintiff") on March 1, 2005. We also have before us a Motion for Summary Judgment (doc. 20) filed by Defendants Litton Industries, Inc. Employees' Health/Long Term Disability Plan and Unum Life Insurance Company of American (collectively "Defendants") on March 1, 2005.

For the reasons that follow, we will grant Plaintiff's Motion for Summary Judgment and deny Defendants' Motion for Summary Judgment.

1

**PROCEDURAL HISTORY:**

On April 8, 2004 Plaintiff filed a complaint against Litton Industries, Inc. ("Litton") and Unum Life Insurance Company of America ("Unum") in the United States District Court for the Middle District of Pennsylvania arising under the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*   (See Rec. Doc. 1).  In Count I of the complaint, Plaintiff contended that Defendants failed to pay long-term disability benefits owed to Plaintiffs and Count II asserted a claim under Pennsylvania's Insurance Bad Faith Statute, 42 Pa.C.S. § 8371.

On September 20, 2004, with consent of defense counsel, Plaintiff filed an amended complaint, within which Plaintiff amended the names of the parties, alleged that subsequent to the filing of the complaint Defendants had issued an unfavorable decision regarding Plaintiff's disability benefit claim, and dropped the bad faith claim previously asserted.  (See Rec. Doc. 14).  Plaintiff named Litton Industries, Inc., Employees' Long-Term Disability Plan ("the Plan") and Unum as defendants (collectively "Defendants").  An answer was filed to the amended complaint on October 4, 2004.  (See Rec. Doc. 15).

Discovery in the above-captioned action closed on February 18, 2005.  On March 1, 2005, both parties filed Motions for Summary Judgment, which have

been briefed by the parties.  The instant Motions are therefore ripe for disposition.

## STANDARD OF REVIEW:

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED .R. CIV. P.  56©); see also Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990).  The party moving for summary judgment bears the burden of showing "there is no genuine issue for trial."  Young v. Quinlan, 960 F.2d 351, 357 (3d Cir. 1992).  Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences which a fact finder could draw from them.  Peterson v. Lehigh Valley Dist. Council, 676 F.2d 81, 84 (3d Cir. 1982).

Initially, the moving party has a burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corporation v. Catrett, 477 U.S. 317, 323 (1986).  This may be met by the moving party pointing out to the court that there is an absence of evidence to support an essential element as to which the non-moving party will bear the burden of proof at trial.  Id. at 325.

Federal Rule of Civil Procedure 56 provides that, where such a motion is made and properly supported, the non-moving party must then show by affidavits, pleadings, depositions, answers to interrogatories, and admissions on file, that

there is a genuine issue for trial. FED. R. CIV. P. 56(e). The United States Supreme Court has commented that this requirement is tantamount to the non-moving party making a sufficient showing as to the essential elements of their case that a reasonable jury could find in its favor. Celotex Corp., 477 U.S. at 322-23.

It is important to note that "the non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact." Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 511 (3d Cir. 1994) (citation omitted). However, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) (citations omitted).

Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)(emphasis in original). "As to materiality, the substantive law will identify which facts are material." Id. at 248. A dispute is considered to be genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

4

**STATEMENT OF RELEVANT FACTS:**

We initially note that we will, where necessary, view the facts and all inferences to be drawn therefrom, in the light most favorable to the nonmoving party in our analysis of the pending motions.

As of May 2, 2000, Plaintiff was an employee of Litton and was eligible to participate in the Plan.  On or about May 2, 2000, Plaintiff was involved in a motor vehicle accident that caused or aggravated the following conditions: fibromyaligia, degenerative joint disease, back and neck muscle spasms, bursitis, chronic pain, including migraine headaches, and depression secondary to the chronic pain. Following the applicable elimination period, Plaintiff began receiving long-term disability benefits in the amount of $1098.23 per month on or about November 2, 2000.  By letter dated April 4, 2002, the Plan's administrative agent, Metropolitan Life Insurance Company ("MetLife") informed Plaintiff that the first 24-months of disability would end on November 1, 2002, and that MetLife would begin reviewing her claim for long-term disability ("LTD") benefits based upon whether she was precluded from performing "any job for which [she was] reasonably qualified based on [her] training, education and experience."  (Defs.' SMF at ¶ 10).

By letter dated February 24, 2003, MetLife informed Plaintiff that her

benefits ceased as of November 1, 2002 because her claim did not meet the criteria

for continued benefits under the Plan.  The letter advised Plaintiff that she had 180

days after receipt of the denial letter to file an appeal for the termination of her

benefits.  By letter addressed to MetLife and dated August 1, 2003, Plaintiff's

attorney appealed the denial of Plaintiff's claim.  MetLife sent Plaintiff a letter on

August 6, 2003, advising her that MetLife would rule on her appeal within 45 days

of its receipt of the appeal, taking an additional 45 days if there were special

circumstances requiring additional time for MetLife to complete the review, and if

MetLife notified Plaintiff of the special circumstances in writing.  By e-mail dated

November 12, 2003, in response to a status inquiry, MetLife informed Plaintiff's

attorney that its appeals unit determined Plaintiff's claim should be reinstated.  The

November 12, 2003 e-mail read as follows:

> Our appeals unit determined that Ms. Ott's long-term disability claim
> was to be reinstated.  As the disability carrier changed effective July
> 1, 2003 to Unum Provident, it was sent to them to reinstate as this is
> an advise to pay group it would need to go to the new carrier.  I sent
> the file September 17, 2003.  Per your voice mail advising that they
> have not received it, I have requested the file be printed again.  I will
> FedEx this to them so that we have a way of tracking this.  If you have
> further questions, please contact me.  Rhonda Sangonette

See Rec. Doc. 22, Ex. Q.

By e-mail dated January 14, 2004, Unum informed Plaintiff's attorney that

review of Plaintiff's claim was continuing.  Unum further informed Plaintiff's

attorney that it would begin issuing LTD benefits as of January 1, 2004, and

continue to pay benefits until Unum made a final determination on Plaintiff's

claim.  The e-mail addressed to Plaintiff's attorney reads, in pertinent part, as

follows:

> Until we have made a final determination on [Jeanette Ott's]
> eligibility for benefits, we will begin issuing benefits effective 1/1/04
> and continue the monthly benefit until a final determination has been
> made.  This payment or any possible future payments, until we advise
> you otherwise, are being made under Reservation of Rights.  This
> means that payment cannot be construed as an admission of present or
> future liability, and we reserve the right to enforce any and all
> provisions of the plan.

See Rec. Doc. 23, Ex. S.

Plaintiff states that as time passed and no final decision from Unum on the

appeal was forthcoming, Plaintiff filed the instant action on April 8, 2004.

Thereafter, on June 22, 2004, Unum issued a letter stating that Plaintiff's appeal

was denied and her benefits were being terminated.  Unum found Plaintiff to be

ineligible for benefits beyond November 2, 2002.  Additionally, the letter explains

that Plaintiff failed to provide information sufficient to support the conclusion that

she was unable to perform all sedentary jobs.  Plaintiff characterizes the appeal

denial as a denial on the basis of reports of two physicians who had never

examined or even spoke to Plaintiff, and a rejection of the opinions of Plaintiff's

family physician, her psychiatrist, and her orthopedist, to the effect that Plaintiff

was incapable of any sort of work.  Plaintiff also submits that the denial rejected the diagnoses of Plaintiff's neurologist, rheumatologist, and pain management specialist.

## DISCUSSION:

In her Motion for Summary Judgment, Plaintiff argues that Defendants' failure to decide her appeal from the termination of her disability claim in the time limits established by ERISA and Defendants' own policies allows the Court to review Plaintiff's disability status *de novo*.  Plaintiff contends that the undisputed facts establish that the Plan Administrator violated Plaintiff's rights under ERISA by illegally delaying its decision on Plaintiff's appeal from the termination of her LTD benefits.  (Pl.'s Mot. Summ. J. at ¶ 2).  Plaintiff asserts that having been advised that, following her appeal, her claim was reinstated, Defendants are estopped from denying her appeal.  Id. at ¶ 3.  Moreover, Plaintiff submits that the undisputed facts indicate that the Plan Administrator abused its discretion in terminating Plaintiff's disability benefits, in that she is incapable of performing any gainful work.  Id. at ¶ 4.

Defendants counter by arguing in their Motion for Summary Judgment that there is no material issue of disputed fact on the question of whether Plaintiff is entitled to LTD benefits after November 2, 2002, under the terms of the Plan.

(Defs.' Mot. Summ. J. at ¶ 3).  Additionally, Defendants assert that an action to recover plan benefits under ERISA should be judicially reviewed under an arbitrary and capricious standard when, as in this case, the Plan expressly reserves discretionary authority to determine eligibility for benefits or to construe the terms of the Plan to the Plan Administrator, and the Plan provides its Administrator with authority to delegate its duties.  Defendants assert that Unum's decision that Plaintiff was not entitled to LTD benefits on or after November 2, 2002 was not arbitrary and capricious.

### A.     <u>Applicable Standard of Review</u>

Under ERISA, a court reviewing an administrator's decision to deny benefits is by default reviewed *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine the employee's eligibility or construe the terms of the plan."  <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989); <u>Stratton v. E.I. DuPont De Nemours & Co.</u>, 363 F.3d 250, 253 (3d Cir. 2004).  If a plan provides discretionary authority to the administrator or fiduciary, then a reviewing court applies a form of arbitrary and capricious review.  <u>Firestone Tire & Rubber Co.</u>, 489 U.S. at 111-12, 115; <u>see</u> <u>Mitchell v. Eastman Kodak Co.</u>, 113 F.3d 433, 437 (3d Cir. 1997).  Discretionary authority can be provided for by express or implied language in the benefit plan.  <u>Luby v. Teamsters Health,</u>

Welfare, & Pension Trust, 944 F.2d 1176, 1180 (3d Cir. 1991).  Whether that arbitrary and capricious review is heightened in any way depends on the presence of potentially conflicted ERISA fiduciaries and is determined on a sliding scale that we will discuss in further detail below.  Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 379 (3d Cir. 2000).

The scope of discovery depends upon the standard of review.  In the Third Circuit, "a district court exercising de novo review over an ERISA determination between beneficiary claimants is not limited to the evidence before the Fund's Administrator."  Luby, 944 F.2d at 1184-85.  In sharp contrast, the record available to a court conducting an arbitrary and capricious review is the record made before the plan administrator, which cannot be supplemented during litigation.  See Kosiba v. Merck & Co., 384 F.3d 58, 67 n.5 (3d Cir. 2004)(citing Mitchell, 113 F.3d at 440).  Nevertheless, when a reviewing court is deciding whether to employ the arbitrary and capricious standard or a more heightened standard of review, it may consider evidence of potential biases and conflicts of interest that are not found in the administrator's record.  Id.

## I.  **Arbitrary & Capricious Review**

As we previously explained, under ERISA, a court reviewing an

administrator's decision to deny benefits is by default conducting an analysis *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine the employee's eligibility or construe the terms of the plan." Firestone Tire & Rubber Co., 489 U.S. at 115; Stratton, 363 F.3d at 253. Additionally, if a plan provides discretionary authority to the administrator or fiduciary, then a reviewing court applies a form of arbitrary and capricious review. Firestone Tire & Rubber Co., 489 U.S. at 111-12, 115; see Mitchell, 113 F.3d at 437.

To determine the proper standard of review, we must begin with the language of the Plan.  In this case, as Defendants submit, the Plan expressly provides the Plan Administrator with discretionary authority to interpret the Plan and to decide any and all matters arising from the Plan.  Moreover, the Plan provides its Administrator with authority to delegate its duties.

The Plan states, in pertinent part, as follows:

> The Plan is administered by the Plan Administrator, a named
> Fiduciary under the Plan.  The Plan Administrator acts in the sole
> interest of the Plan participants and their beneficiaries.
>
> **The Plan Administrator has the discretion to interpret the Plan**
> **and to decide any and all matters arising from the Plan.  The Plan**
> **Administrator has delegated Metropolitan Life Insurance**
> **Company to have sole power and duty to review and determine**
> **claims filed under the Plan and the power and duty to process all**
> **claims and appeals and to provide other administrative services.**

<u>See</u> Rec. Doc. 22, Ex. A (emphasis added).  In the case <u>sub judice</u>, the Plan

Administrator first delegated its authority to MetLife and as of July 1, 2003, Unum

became the Plan Administrator.  On the basis of the Plan's plain language, we

conclude that the Plan provided the Plan Administrator with the authority to make

decisions with respect to eligibility.  Accordingly, we will review the decision

regarding Plaintiff's claim for LTD benefits under the arbitrary and capricious

standard of review on the basis of the administrative record before Unum at the

time of the decision to deny Plaintiff's claim.  <u>See</u> <u>Kosiba</u>, 384 F.3d at 67 n.5

(<u>citing</u> <u>Mitchell</u>, 113 F.3d at 440).

 Plaintiff argues that Defendants' failure to decide her appeal from the

termination of her disability claim within the time limits established by ERISA and

Defendants' own policies allows the Court to review Plaintiff's disability status *de

novo*.  We disagree for the reasons that follow and find the cases cited by Plaintiff

in support thereof to be factually distinguishable from this case.

The only precedential decision cited by Plaintiff in support of her contention

that a *de novo* standard of review should be employed is <u>Gritzer v. TBS, Inc.</u>, 275

F.3d 291 (3d Cir. 2002).  In <u>Gritzer</u>, the Third Circuit Court of Appeals explained

that it was called upon "to determine the appropriate standard of review where a

pension plan allows for discretion but discretion is not exercised." <u>Id.</u> at 293.

12

After several unsuccessful inquiries, appellants filed a claim letter with the plan

administrator to which the administrator failed to respond within 90 days.  An

important distinguishing factor between <u>Gritzer</u> and this case is that in <u>Gritzer,</u>

appellants' claim was thereby "deemed denied."  <u>Id.</u> at 294.  Based on that denial,

appellants filed suit.  "Nearly five months later, Westinghouse finally responded to

appellants' claim and denied it on the merits for essentially the same reasons that

Westinghouse invokes here."  <u>Id.</u>  The Third Circuit Court of Appeals explained

that there was no analysis or reasoning to which the trial court could have deferred

under the arbitrary and capricious standard, as on the basis of the applicable plan,

the appeal was "deemed denied" after the plan administrator failed to respond

within 90 days.  <u>Id.</u> at 294.  The Third Circuit emphasized that had discretion in

fact been exercised in the course of denying benefits, the applicable standard

would have been arbitrary and capricious; however, it reviewed the denial of

benefits *de novo* based upon "the trustee's failure to act or to exercise his or her

discretion."  <u>Id.</u> at 296.

Stated differently, as the Ninth Circuit Court of Appeals explained in

another case cited by Plaintiff in support of her assertion that *de novo* review is

warranted, <u>Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income</u>

<u>Protection Plan</u>, 349 F.3d 1098 (9th Cir. 2003), the Third Circuit applied *de novo*

review to the plan in <u>Gritzer</u> that otherwise granted discretion to the administration because under the plan the employee pension claim was **deemed denied**.  <u>Id.</u> at 1106.  Although courts of appeal have split on the question of whether a "deemed denied" claim is always entitled to *de novo* review, a majority of circuits have held that, absent substantial compliance with the deadlines, *de novo* review applies on the ground that inaction is not a valid exercise of expertise upon which to defer.  <u>See</u> <u>Nichols v. Prudential Ins. Co. of America</u>, 2005 WL 913762, *8 (2nd Cir. 2005); <u>see</u>, <u>e.g.</u>, <u>Jebian</u>, 349 F.3d at 1106-7; <u>Gilbertson v. Allied Signal, Inc.</u>, 328 F.3d 625, 632-33 (10th Cir. 2003); <u>Gritzer</u>, 275 F.3d at 295.

Thus, the above-referenced cases are factually distinguishable from the case <u>sub</u> <u>judice</u>, as they are cases in which the claim at issue was "deemed denied."  In this case, no claim was "deemed denied" either pursuant to applicable ERISA regulations or pursuant to the Plan.  Importantly, and as submitted by Defendants, the Secretary of Labor amended the applicable ERISA regulations in 2000.  The pertinent regulation, 29 C.F.R. § 2560, first promulgated in 1977, was amended in 2000 such that language stating that a claim is deemed denied on review if a claimant did not receive written notice within the relevant time period, was removed.  <u>See</u> <u>Pension and Welfare Benefits Administration</u>, 65 Fed. Reg. 70246, 70265, 70268-69 (Nov. 21, 2000); <u>see also</u> <u>Jebian</u>, 349 F.3d at 1193, n.5.  Excised

14

from the new regulation is the provision that transgressions of time limitations will result in the claim being "deemed denied." <u>See</u> 29 C.F.R. § 2560.503-1(h) (2002); <u>see also</u> <u>Jebian</u>, 349 F.3d at 1193, n.5.

The 2000 amendments apply to claims filed on or after January 1, 2002.  29 C.F.R. § 2560.503-1(i)(3)(i) (2002).  In this case, as we previously explained, Plaintiff began receiving LTD benefits on or about November 2, 2000.  By letter dated February 24, 2003, MetLife informed Plaintiff that her benefits ceased as of November 1, 2002 because her claim did not meet the criteria for continued benefits under the Plan.  By letter addressed to MetLife and dated August 1, 2003, Plaintiff's attorney appealed the denial of Plaintiff's claim. Accordingly, Plaintiff's claim for continued LTD benefits arose after the January 1, 2002 effective date of the 2000 ERISA amendments and the applicable regulations did not render Plaintiff's claim denied before Unum issued its June 24, 2004 decision.  It is also important to note that unlike the plan in <u>Jebian</u>, the Plan at issue does not contain a provision that renders a claim "deemed denied" or effectively denied if the Plan Administrator fails to comply with the applicable time limitations.  (<u>See</u> Rec. Doc. 22, Ex. A).

We therefore find the cases cited by Plaintiff in support of her argument, that Defendants' failure to decide Plaintiff's appeal from the termination of her

disability claim in the time limits established by ERISA and Defendants' own

policies allows the court to review her disability claim *de novo*, to be factually

distinguishable.  Accordingly, a *de novo* standard of review is not warranted in this

case.  As we previous explained, we will review the decision regarding Plaintiff's

claim for LTD benefits under the arbitrary and capricious standard of review on the

basis of the administrative record before Unum at the time of the decision to deny

Plaintiff's claim.  See Kosiba, 384 F.3d at 67 n.5 (citing Mitchell, 113 F.3d at 440).


### a.      "Arbitrary & Capricious" versus "Heightened Arbitrary & Capricious" Review

Our consideration of the proper standard of review does not end with the

foregoing analysis, but warrants further review for the reasons that follow.  In

Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377 (3d Cir. 2000), the Third

Circuit Court of Appeals held that in reviewing an ERISA plan fiduciary's

discretionary determination regarding benefits, a court must take into account the

existence of the structural conflict of interest present when a financially interested

entity also makes benefit determinations.  See Kosiba, 384 F.3d at 64.  In Pinto, the

Third Circuit adopted a "sliding scale" approach, in which the district courts must

"consider the nature and degree of apparent conflicts with a view to shaping their

arbitrary and capricious review of the benefit determinations of discretionary

decisionmakers." Id. (citing Pinto, 214 F.3d at 393). The afore-mentioned "sliding scale method" "intensifies the degree of scrutiny to match the degree of conflict." Id. at 379.

As the Third Circuit recently explained in Kosiba, Pinto offered a nonexclusive list of factors to consider in assessing whether a structural conflict of interest warranting heightened review exists. The factors a court considers in determining the degree of scrutiny to afford the administrator in the determination to terminate benefits include: "(1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the fiduciary, as the company's financial or structural deterioration might negatively impact the 'presumed desire to maintain employee satisfaction.'" Stratton, 363 F.3d at 254 (citing Pinto, 214 F.3d at 392). In Pinto itself, the Third Circuit concluded that "heightened arbitrary and capricious review" or review "on the far end of the arbitrary and capricious 'range'" was appropriate because Pinto's insurer both made benefits determinations and funded the benefits, and because of various procedural anomalies that tended to suggest that "whenever it was at a crossroads, [the insurer defendant] chose the decision disfavorable to Pinto." Pinto, 214 F.3d at 393-4. Accordingly, under Pinto, a conflict of interest is presumed when an insurance

17

company both determines eligibility for benefits and pays out those benefits from its own funds, because there exists an "active incentive to deny close claims in order to keep costs down and keep themselves competitive so that companies will choose to use them as their insurers." Id. at 388.[1]

The Third Circuit instructed in Kosiba that structural conflicts of interest present when a financially interested entity also makes benefit determinations is not the only cause for heightened review. "Our precedents establish at least one more cause for heightened review: demonstrated procedural irregularity, bias, or unfairness in the review of the claimant's application for benefits." Kosiba, 384 F.3d at 66. "The Pinto panel's decision to apply heightened review turned almost as much on the procedures afforded to Pinto as it did on her insurer's financial conflict of interest." Id.; see Pinto, 214 F.3d at 393 ("Looking at the final decision,

---

[1] We note that although Plaintiff argues that Unum's decision lacked impartiality in reviewing Plaintiff's disability claim and cites to Hines v. Unum Life Ins. Co. of America, 110 F.Supp.2d 458 (W.D. Va. 2000), in support thereof without further elaboration, Defendants assert that no evidence of partiality exists in this case. In Hines, Plaintiff insured sued Defendant insurer alleging that Defendant wrongfully denied her disability benefits initially, and wrongfully refused thereafter to fully and fairly review her claim in upholding the previous denial. Defendant maintained that Plaintiff's condition did not meet the policy's definitional preconditions for "total disability." The court reviewed the record under the modified abuse of discretion standard because Defendant was both the insurer and the administrator. Id. at 462.

In this case, as Defendants submit, Unum acts only as a third-party administrator, the employer retains final decision-making authority, and the employer uses its own funds to pay benefits. (See Rec. Doc. 22, Ex. L, at Section 3.7 and Addendum-i). We therefore do not find evidence of partiality or a conflict of interest of the type which the Third Circuit identified in Pinto, when an insurance company both determines eligibility for benefits and pays out those benefits from its own funds.

we see a selectivity that appears self-serving in the administrator's use of [one

doctor's] expertise."); <u>Id.</u> ("inconsistent treatment of the same facts"); <u>Id.</u> at 394

(suggesting that "whenever it was at a crossroads, Reliance Standard chose the

decision disfavorable to Pinto").

We will apply a moderately heightened arbitrary and capricious review to

the Plan Administrator's decision based on Defendants' clear procedural violations

of both applicable ERISA regulations and the Plan at issue by not providing a

decision on Plaintiff's appeal until June 22, 2004 and for the reasons that follow.

It is important to initially set forth the backdrop of the applicable ERISA

regulations regarding appealing adverse benefit determinations, as well as the

Plan's provision governing appeals of denied claims.  First, 29 C.F.R. § 2560.503-

1 "Claims Procedure" provides, in pertinent part, as follows:

> In accordance with the authority of sections 503 and 505 of the
> Employee Retirement Income Security Act of 1974 (ERISA or the
> Act), 29 U.S.C. 1133, 1135, this section sets forth minimum
> requirements for employee benefit plan procedures pertaining to
> claims for benefits by participants and beneficiaries (hereinafter
> referred to as claimants).

29 C.F.R. § 2560.503-1(a).  In addition, as Plaintiff points out, § 2560.503-1(h),

"Appeal of Adverse Benefit Determinations," provides within the "Disability

Claims" section that the Plan Administrator shall notify a claimant of the plan's

benefit determination on review within a reasonable period of time, "but not later

19

than 45 days after receipt of the claimant's request for review by the plan, unless the plan administrator determines that special circumstances (such as the need to hold a hearing, if the plan's procedures provide for a hearing) require an extension of time for processing the claim." See 29 C.F.R. § 2560.503-1(h); 29 C.F.R. § 2560.503-1(f)(3), 29 C.R.F. § 2560.503-1(i)(3). If the Plan Administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the determination of the initial 45 day period. In no event shall such extension exceed a period of 45 days from the end of the initial period. The extension notice shall indicate the special circumstances requiring an extension of time and the date by which the plan expects to render the determination on review. See id.

Second, the Plan at issue provides, in pertinent part, as follows:

Appeal of Denial of Claims

The Participant or beneficiary whose claim for benefits is denied by the Claims Administrator may appeal the decision denying the claim to the Claims Administrator within ninety (90) days of the receipt of such decision.

The appeal shall be addressed to the Claims Administrator in writing and shall state the reasons why he should grant the appeal. The Claims Administrator shall conduct a full and fair review of the claim and will issue his decision within sixty (60) days of receipt of the appeal unless there are special circumstances, in which case a decision will be rendered within 120 days of receipt of appeal. The Claims Administrator's decision upon appeal shall be final, conclusive and

binding on all parties.

<u>See</u> Rec. Doc. 22, Ex. A, Section E at 16.

In the case <u>sub</u> <u>judice</u>, Plaintiff filed a timely appeal with MetLife on August

1, 2003.  On August 6, 2003, Plaintiff's counsel received a letter from MetLife,

which stated, in pertinent part, as follows:

> We will evaluate the documentation and advise you in writing within 45 days of our determination.  If there are special circumstances requiring additional time to complete our review, we may take up to an additional 45 days, but only after notifying you of the special circumstances in writing.

<u>See</u> Rec. Doc. 22, Ex. N; <u>see</u> <u>also</u> Defs.' SMF at ¶ 22.  Within 45 days of August 6,

2003, neither Plaintiff, nor her attorney, were advised in writing of the

determination.  Moreover, neither Plaintiff, nor her attorney, were sent any

explanation of special circumstances requiring more time.

The first response Plaintiff received regarding her appeal consisted of an   e-

mail from Rhonda Sangonette of MetLife, which was sent on November 12, 2003,

nearly 100 days after the afore-mentioned August 6, 2003 letter.  (<u>See</u> Defs.' SMF

at ¶ 25; <u>see</u> <u>also</u> Rec. Doc. 22, Ex. Q).  To reiterate, the November 12, 2003 e-mail

reads, as follows:

> Our appeals unit determined that Ms. Ott's long-term disability claim was to be reinstated.  As the disability carrier changed effective 7/1/03 to UNUM Provident, it was sent to them to reinstate as this is an advise to pay group it would need to go to the new carrier.  I sent the

file 9/17/03.  Per your voicemail advising that they have not received it I have requested the file be printed again.  I will fed ex this to them, so that we have a way of tracking this.  If you have further questions please contact me.

Id.  This provided Plaintiff with the justifiable impression that her claim had been "reinstated," and subsequently by e-mail dated January 14, 2004, Unum informed Plaintiff's attorney that review of Plaintiff's claim was continuing.[2]  Unum further informed Plaintiff's attorney that it would begin issuing LTD benefits as of January 1, 2004, and continue to pay benefits until Unum made a final determination on Plaintiff's claim.  It is appropriate to restate the substance of the January 14, 2004 e-mail addressed to Plaintiff's attorney, which reads in pertinent part as follows:

> Until we have made a final determination on [Jeanette Ott's] eligibility for benefits, we will begin issuing benefits effective 1/1/04 and continue the monthly benefit until a final determination has been made.  This payment or any possible future payments, until we advise you otherwise, are being made under Reservation of Rights.  This means that payment cannot be construed as an admission of present or future liability, and we reserve the right to enforce any and all

---

[2] We note that documentation submitted by Defendants reveals that MetLife retained the ability to review appeals pending at the time Unum became the Plan Administrator effective July 1, 2003.  (Becker Second Aff. at ¶¶ 2-3).  Once MetLife's review of an appeal concluded, it had to forward the claim file to Unum with a recommendation. Id. at ¶ 4.  Unum received Plaintiff's claim file from MetLife with an "advise to pay," which means that MetLife recommended Unum reinstate payment of benefits to Plaintiff. Id. at ¶¶ 5-6.  Under the terms of the Plan, Unum retained decision-making authority to review a claim upon receiving a recommendation from MetLife and Unum was not bound by any recommendation it received from MetLife. Id. at ¶¶ 7-8.

provisions of the plan.

<u>See</u> Rec. Doc. 23, Ex. S.

Plaintiff states that as time passed and no final decision from Unum on the appeal was forthcoming, Plaintiff filed the instant action on April 8, 2004. Thereafter, on June 22, 2004, **nearly one year** after Plaintiff filed the instant appeal, Unum issued a letter stating that Plaintiff's appeal was denied and that her benefits were being terminated.  (<u>See</u> Rec. Doc. 23, Ex. AA).  Unum's determination found Plaintiff to be ineligible for benefits beyond November 2, 2002.

Although Unum's June 22, 2004 letter ultimately denying Plaintiff's claim for LTD benefits provided reasons for the denial, Defendants committed clear procedural violations of the applicable ERISA regulations and the Plan at issue by not providing a decision on Plaintiff's appeal until June 22, 2004.  By not issuing a decision on Plaintiff's LTD benefits until nearly one year had passed from the time of her appeal, Unum violated the following applicable provisions.  First, Unum violated ERISA provisions requiring plan administrators to notify claimants of the plan's benefit determination on review within a reasonable period of time, but not later than 45 days after receipt of the claimant's request for review by the plan, unless the plan administrator determines that special circumstances, such as the

need to hold a hearing, require an extension of time for processing the claim.  <u>See</u>

29 C.F.R. § 2560.503-1(h); 29 C.F.R. § 2560.503-1(f)(3), 29 C.R.F. § 2560.503-

1(i)(3).  Second, Unum violated the provision of the Plan at issue that states that

the claims administrator shall conduct a full and fair review of the claim and will

issue a decision within 60 days of receipt of the appeal unless there are special

circumstances, in which case a decision will be rendered within 120 days of receipt

of appeal.  <u>See</u> Rec. Doc. 22, Ex. A, Section E at 16.

Clear procedural violations of the foregoing provisions and the procedural

irregularities as noted require that we apply a moderately heightened arbitrary and

capricious review to the Plan Administrator's decision in the case <u>sub</u> <u>judice</u>.  <u>See</u>

<u>Kosiba</u>, 384 F.3d 58, 66 (3d Cir. 2004).[3]

The Third Circuit Court of Appeals has instructed that in reviewing a denial

of benefits under the "arbitrary and capricious" standard, a plan administrator's

decision will be overturned only if it is "clearly not supported by the evidence in

---

[3] Defendants assert that Unum substantially complied with applicable ERISA regulations in that it provided a proper, detailed notification of the denial of benefits, the reasons therefor, and the avenue by which Plaintiff may seek review of the decision.  Defendants maintain that any failure on the part of MetLife to properly communicate to Plaintiff during the transition of her file to Unum cannot be attributable to Defendants because MetLife is not a defendant in this case.  (<u>See</u> Defs.' Br. Opp. Pl.'s Mot. Summ. J. at 8-10).

We need not reach Defendants' substantial compliance argument as we have determined that Defendants' procedural violations and irregularities require that we apply a moderately heightened arbitrary and capricious standard of review.

the record or the administrator has failed to comply with the procedures required by the plan." Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., 222 F.3d 123, 129 (3d Cir. 2000)(quoting Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 41 (3d Cir. 1993)).  The Third Circuit has recently instructed that a court should affirm the plan administrator's determination as long as it is supported by substantial evidence in the record, even if the record also contains substantial evidence that would support a different result.  Johnson v. UMWA Health and Retirement Funds, 2005 U.S. App. LEXIS 2115, * 8 (3d Cir. 2005).  "[A] court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits."  Orvosh, 222 F.3d at 129 (internal quotations omitted).  Furthermore, "whether a claim decision is arbitrary and capricious requires a determination 'whether there was a reasonable basis for [the administrator's] decision, based upon the facts as known by the administrator at the time the decision was made.'"  Bader v. RHI Refractories America, Inc., 111 Fed. Appx. 117, 120-21 (3d Cir. 2004)(quoting Jett v. Blue Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1139 (11th Cir. 1989)).

Moreover, in applying the heightened arbitrary and capricious standard of review, the Third Circuit Court of Appeals has stated that courts should look not only at the result–whether it is supported by reason–but at the process by which the

result is achieved.  Sweeney v. Std. Ins. Co., 276 F.Supp.2d 388, 394 (E.D.Pa. 2003)(quoting Pinto, 214 F.3d at 393).  "A court should intensify the level of scrutiny it applies to an insurer's decision if they are any procedural irregularities in the decision-making process."  Id. at 394.

**B.     Denial of Benefits**

Unum's June 24, 2004 denial of benefits letter provided three bases for the denial of her claim for LTD benefits; however, only one such base for denial is at issue in this case; namely, that the medical information indicates that Plaintiff has the capacity and skills to perform another occupation.[4]  (See Rec. Doc. 23, Ex. AA).

**i.     The Plan**

In determining whether the Plan Administrator's decision to deny Plaintiff LTD benefits was arbitrary and capricious, we begin with the Plan itself, since an ERISA plan administrator must "discharge his duties with respect to a plan...in

---

[4] First, it appears undisputed by the parties that Plaintiff exhausted her 24-month entitlement to benefits premised on a Mental and Nervous Disorder or Disease by November 2, 2002, which was a basis for denial of her LTD benefits.  Second, the Plan requires that Plaintiff be under the regular and appropriate care of a qualified physician; however, Unum's letter stated that according to the medical records on file, Plaintiff was not under the regular care since July 2003.  A March 24, 2005 submission to the Court from defense counsel states that Plaintiff supplied as an attachment to her Statement of Undisputed Material Facts a copy of a medical report from treatment she underwent in February 2004 and that this was part of Unum's claim file at the time of the June 24, 2004 decision.  In light of this discrepancy, Defendants notified the Court and Plaintiff that they abandoned as a cause for the denial of benefits Plaintiff's failure to remain under the regular care of a physician.

accordance with the documents and instruments governing the plan insofar as such

documents and instruments are consistent with the provisions of [ERISA]."

Mitchell, 113 F.3d at 439; see 29 U.S.C. § 1104(a)(1)(D).

The standard of disability under the Plan transitions after two years of

benefit payments, which Plaintiff undisputedly received, from inability to perform

one's regular occupation to the following definition of "total disability:"

> [C]omplete inability of the Participant to perform any and every duty of any gainful occupation for which he is reasonably fitted by training, education or experience.

See Rec. Doc. 22, Ex. A.  LTD benefits are not automatic and a claimant bears the

burden of demonstrating that he/she qualifies for benefits.  Therefore, the Plan at

issue required that Plaintiff show that as of November 2, 2002, two years after she

received LTD disability payments under the Plan's initial definition of "total

disability," that she was completely unable to perform any and every duty of any

gainful occupation for which she was reasonably fitted by training, education or

experience.

### ii.    Plaintiff's Record Support

To determine whether Plaintiff carried her burden, we look to the record as a

whole.  See Mitchell, 113 F.3d at 440.  As we previously explained, under the

arbitrary and capricious standard of review, the "whole" record consists of that

27

evidence that was before the administrator when he made the decision being reviewed.[5] Id.; see also Luby, 944 F.2d at 1184, n.8.

Plaintiff presented medical evidence in the form of letters from treating doctors, a fibromyalgia questionnaire, medical records, an MRI report, and two residual physical functional capacity assessments ("FCEs") performed by Dr. Ellis, Plaintiff's primary care physician, which she alleges demonstrate that she suffers from migraine headaches, fibromyalgia, problems in her cervical and lumbar spine, as well as depression.  Plaintiff also has "moderately severe obstructive sleep apnea."  Plaintiff supported her claim of disability with documentation from the following treating doctors: Dr. Calvert, her psychiatrist; Dr. Ellis, her primary care physician; Dr. DiSimone, her orthopedist; Dr. Olinsky, her neurologist; Dr. Rigal, her pain management specialist; Dr. Tuffaha, her neurosurgeon; Dr. Shenberger; her rheumatologist; and a physician assistant to Dr. Georgy, Theresa Sander.

## a.    **Migraine Headaches & Back Problems**

While Plaintiff did present evidence in support of her migraine headache diagnosis to MetLife, which was ultimately forwarded to the Defendants to review,

---

[5] Defendants accurately submit that as Plaintiff's favorable outcome to her claim for Social Security Disability Insurance ("SSDI") benefits was issued on July 8, 2004, after Unum issued its June 24, 2004 decision, and was therefore not before the Plan Administrator at the time the decision was made to deny Plaintiff LTD benefits, the Court is unable to consider the SSDI decision pursuant to the arbitrary and capricious standard of review.

including but not limited to documentation from Dr. Olinsky and Dr. Rigal, we do not find that the Defendants' decision to deny LTD benefits on that basis was arbitrary and capricious.

We will now address Plaintiff's back condition. We initially note that within the letter denying Plaintiff LTD benefits, the Defendants stated that there is "no medical information to support your back condition or the severity of any other physical impairment such that would preclude you from performing full time sedentary work...You do appear to have ongoing low back pain however; this could be treated with NSAID's, home exercises, occasional physical therapy and, periodic injections as needed. Reasonable restrictions and limitations would be: no lifting greater than 20 lbs, no prolonged standing/walking, no repetitive climbing, no repetitive or prolonged bending/stopping/twisting, and no repetitive or prolonged squatting/kneeling. Additionally, you should be permitted to change positions periodically." (See Rec. Doc. 23, Ex. AA).

In support of Plaintiff's claim of LTD disability relating to problems in her cervical and lumbar spine, Plaintiff points to an x-ray taken on January 31, 2002 that reflects the following: "An altered curvature of the cervical spine and straightening and even mild reversal of the cervical lordosis. Minimal disc space narrowing at C4-C5. No significant change when compared to 5/5/00." (See Rec.

Doc. 26, Appendix pg. 28).  Second, Plaintiff directs the Court to an MRI of her

spine that reflects the following: "Signal loss consistent with early disc

degeneration at L4-5.  Disc herniation is not seen.  There appears to be a foraminal

compromise on the left at L5-S1, better demonstrated on the axial scans, relating to

facet hypertrophic change, potentially compressing the S1 root.  Minimal

associated disc bulge at this level.  No evidence of disc herniation or significant

foraminal narrowing at more cephalad levels."  Id. at pg. 41.  Additionally, we do

note that in a report dated July 16, 2003, Dr. Rigal provided diagnoses of (1)

lumbar spondylosis, particularly L4-5 and L5-S1; (2) L5-S1 foramital stenosis; (3)

left S1 radiculopathy; (4) multiple somatic complaints; and (5) chronic depression.

  After having carefully reviewed Plaintiff's medical records relating to

problems in her cervical and lumbar spine that were before the Plan Administrator

when the decision at issue was made, we find that Defendants' denial of LTD

benefits on this basis was not arbitrary and capricious.  While it is apparent to the

Court that Plaintiff continues to suffer from pain associated with her low back, we

are in agreement with Defendants' conclusion that this pain can be decreased with

treatment, including but not limited to home exercises, periodic injections, and

physical therapy, if necessary.  Medical records submitted from Dr. Rene R. Rigal,

of the Pain Management Center at Susquehanna Health System, reveal that the

trigger point injections provide significant pain relief to Plaintiff in the cervical and intrascapular region.  Moreover, Plaintiff herself corroborates this by stating that a January 15, 2001 visit with Dr. Rigal "reflected a significant improvement in Plaintiff's pain due to the injection."  (See Rec. Doc. 26, Pl.'s Statement of Undisputed Facts in Supp. Mot. Summ. J, at ¶ 9).

### b. Fibromyalgia

We will now address Plaintiff's contention that she is entitled to LTD benefits as she is disabled due to fibromyalgia.  We initially note that in the letter denying Plaintiff LTD benefits, Defendants stated the following regarding fibromyalgia: "When he [Dr. Ellis] provided a diagnosis of Fibromyalgia we found no information for review which indicates that he arrived at this diagnosis, per protocol by exclusion....Our medical department reviewed the information on file and determined that there is no medical information to support your back condition or the severity of any other physical impairment such that would preclude you from performing full time sedentary work.  Since November 2002, there is no evidence to support that you are disabled due to Fibromyalgia.  They noted that while Fibromyalgia has been provided as a diagnosis the file lacks an examination by which the diagnosis is typically made."  (See Rec. Doc. 23, Ex. AA).

In support of her claim that she is disabled due to fibromyalgia, Plaintiff

asserts that in addition to her primary care physician who diagnosed her with fibromyalgia, Dr. Ellis, three specialists reached the same conclusion. Dr. Ellis' fibromyalgia diagnosis has been confirmed by Dr. Shenburger, Plaintiff's rheumatologist, Dr. Rigal, Plaintiff's pain management specialist, and Dr. Olinsky, Plaintiff's neurologist. In addition, Plaintiff argues that although Dr. Rigal treats the condition with trigger points, Plaintiff's medical records reflect that the treatment is only successful for a limited period of time. Plaintiff maintains that the denial of her appeal for LTD benefits on the basis of reports from two physicians who had never examined or even spoke to Plaintiff and who rejected the opinions of Plaintiff's family physician, psychiatrist, orthopedist to the effect that she was incapable of any sort of work, combined with the rejection of diagnoses of her neurologist, rheumatologist, and pain management specialist is arbitrary and capricious.

In response, Defendants assert that it did not act arbitrarily and capriciously when it determined Plaintiff was not entitled to LTD benefits on or after November 2, 2002. Defendants argue that Unum conducted a full and fair review of all medical evidence that Plaintiff submitted, provided the medical records to two independent physicians for their review, and completed a vocational analysis based on the records. "In response, Plaintiff questions not the thoroughness of Unum's

review nor the qualifications of the independent physicians who reviewed the

medical records.  Rather, Plaintiff offers only her opinion as to how she believes

Unum should interpret her records."  (Defs.' Reply Br. at 7).

At this juncture, it is necessary to provide information concerning the

disease involving muscle and musculoskeletal pain known as fibromyalgia or

fibrositis.  As the Plaintiff accurately submits, the following two appellate courts

have discussed fibromyalgia in regard to Social Security claims.

> Fibromyalgia is a common, but elusive and mysterious, disease, much
> like chronic fatigue syndrome, with which it shares a number of
> features.  Its cause or causes are unknown, there is no cure, and, of
> greatest importance to disability law, its symptoms are entirely
> subjective.  There are no laboratory tests for the presence or severity
> of fibromyalgia.  The principal symptoms are 'pain all over,' fatigue,
> disturbed sleep, stiffness, and – the only symptom that discriminates
> between it and other diseases of a rheumatic character – multiple
> tender spots, more precisely 18 fixed locations on the body...that when
> pressed firmly cause the patient to flinch.

Brown v. Cont'l Cas. Co., 348 F.Supp.2d 358, 360 (E.D. Pa. 2004)(quoting

Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996)(citations omitted)).  Second, the

Sixth Circuit Court of Appeals described the disease by referring to medical

testimony as follows:

> Dr. Crabbs testified at the hearing that he had recently diagnosed
> Preston's primary impairment as fibrositis, a condition only
> recognized in the last several years as a disease involving muscle and
> musculoskeletal pain.  As set forth in the two medical journal articles
> submitted as exhibits by Dr. Crabbs, fibrositis causes severe

> musculoskeletal pain which is accompanied by stiffness and fatigue
> due to the unremitting pain of which fibrositis patients complain.
> Physical examinations will usually yield normal results – a full range
> of motion, no joint swelling, as well as normal muscle strength and
> neurological reactions.   There are no objective tests which can
> conclusively confirm the disease; rather, it is a process of diagnosis by
> exclusion and testing of certain 'focal tender points' on the body for
> acute tenderness which is characteristic in fibrositis patients.  The
> medical literature also indicates that fibrositis patients may have
> psychological disorders.  The disease commonly strikes between the
> ages of 35 and 60 and affects women nine times more than men.

Alvarado v. Chater, 1997 U.S. Dist. LEXIS 903, *2-3 (E.D. Pa. 1997)(quoting

Preston v. Sec. of Health and Human Servs., 854 F.2d 815, 817 (6th Cir. 1988)(per

curiam)).

Additionally, several courts have explained that having fibromyalgia can

result in being disabled or having a disability that may be severe.  See e.g.,

Rodriguez v. McGraw-Hill Cos. Long Term Disability Plan, 297 F.Supp.2d 676,

679 (S.D. N.Y. 2004)(fibromyalgia can result in severe disability); Green-Younger

v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003)(fibromyalgia is a "disabling

impairment" that can qualify an individual for disability payments even though

"there are no objective tests which can conclusively confirm the disease."); 

Sarchet, 78 F.3d at 306 ("Some people may have such a severe case of

fibromyalgia as to be totally disabled from working, Michael Doherty & Drian

Jones, 'Fibromyalgia Syndrome (ABC of Rheumatology),' 310 British Med.J. 386

(1995); Preston v. Secretary of Health & Human Services, 854 F.2d 815, 818 (6th

Cir. 1988)(per curiam), but most do not and the question is whether Sarchet is one

of the minority.").

　　　　With that backdrop, after a detailed and careful review of the record that was

before the Plan Administrator at the time the decision to deny Plaintiff's LTD

benefits was made, and for the reasons that follow, the Court finds that the

assessments of Plaintiff's treating sources established the severity of her

fibromyalgia and the limitations that such disease posed on Plaintiff's capacity to

engage in substantial gainful employment.  The Court further finds that the

utilization by Defendants of two physicians who never examined Plaintiff, as

Defendants admit, but simply rejected the fibromyalgia diagnosis made by Dr.

Ellis, Plaintiff's primary care physician, which was subsequently corroborated by

three specialists, Plaintiff's rheumatologist, pain management specialist, and

neurologist, was arbitrary and capricious, in the Court's moderately heightened

arbitrary and capricious standard of review.

　　　　First, we note that Defendants place particular emphasis on the fact that Dr.

Ellis completed a FCE in September 2001 which provides that Plaintiff could sit

for eight hours during an eight-hour, "competitive workday" on a "continuous

basis" and assert that Dr. Ellis's records contain no subsequent FCE that renders

35

the September 2001 FCE inaccurate.  In response, Plaintiff asserts that she did

attempt to return to work thereafter, but was unable to get through the workday

because of her pain.

The record does not reveal that Dr. Ellis completed a FCE after September

2001, nor does the record reflect that he was requested to perform one despite the

fact that one of Defendants' independent physicians, Dr. Michael C. Randall,

recommended in his report that if there are conflicts concerning Plaintiff's work

capacity, a formal FCE may be helpful.  Additionally, Dr. Ellis's medical record of

April 17, 2002 and letter to Plaintiff's counsel of July 26, 2003 clearly reveal his

medical opinion regarding Plaintiff, after having examined and treated her for a

period of time.

First, although defense counsel omitted a critical sentence present in Dr.

Ellis's April 17, 2002 medical record in submissions to the Court, the Court will

fully quote the pertinent portion of the afore-mentioned medical record, as follows:

> Finally, the Otts indicated today that their insurance company is
> stating that they will discontinue payments on her disability unless
> Jeanette is certified as permanently disabled.  I told them I would be
> reluctant to declare this condition permanent, but if that is what is
> necessary for their insurance, we could do so.  The Otts themselves
> have little hope that Jeanette is going to improve.  *I must admit that I
> am not optimistic either, but I would like to avoid the psychologic
> effect of declaring permanent disability, e.g. essentially saying that
> Jeanette will never improve.*

<u>See</u> Rec. Doc. 26, pg. 31 (emphasis added).  Second, Dr. Ellis's letter of July 26,

2003 addressed  to Plaintiff's counsel, was written in regards to Plaintiff's

counsel's request for comments on Defendants' independent physician opinion

performed by Tracey Schmidt, M.D., a Medicine and Rheumatology Certified

Disability Evaluator, who concluded that Plaintiff's file "appears to lack objective

evidence of physical functional capacity impairment from a sedentary position full

time" and that "the symptoms appear self reported and more subjective in nature."

(<u>See</u> Rec. Doc. 23, Ex. J).  Dr. Ellis's most recent medical opinion regarding

Plaintiff's condition states that Plaintiff has chronic daily pain that "would be

worsened by maintaining a regular seated position for any amount of time that

would be compatible with full-time employment.  I considered this possibility in

the past, and even discussed the possibility of a sedentary job with Jeanette at one

point.  However, given her present functional level, it is my assessment that she

could not tolerate prolonged siting, and that her condition would be worsened by

this...I further believe that Jeanette's condition would be worsened by any gainful

employment, including a full-time sedentary position."   (<u>See</u> Rec. Doc. 23, Ex.

M).

      In addition to Dr. Ellis's medical opinion subsequent to his September 2001

FCE, which demonstrates that he became considerably more pessimistic regarding

Plaintiff's prognosis, we note that a case arising within the Eastern District of Pennsylvania has explained with regard to functional capacity examinations, that such one-time tests cannot hope to present a true picture of an illness characterized by variable symptoms. Brown, 348 F.Supp.2d at 360. "Others have noted the inadequacy of FCEs in determining disability in fibromyalgia cases." Id.; see also Dorsey v. Provident Life & Accident Ins. Co., 167 F.Supp.2d 846, 856 (E.D. Pa. 2001)(noting "evidence that an FCE is a highly questionable tool for determining whether a fibromyalgia patient is disabled").

Second, we will address medical records submitted by Theresa Sander, a Certified Registered Nurser Practitioner to Dr. Georgy, on which Defendants place emphasis. Defendants argue that Ms. Sander opined that Plaintiff had the ability to bend, kneel, crawl, and climb stairs occasionally, push/pull up to ten pounds frequently, reach about her should continuously, and further noted that Plaintiff "wants to stay at home," exhibited a "lack of motivation," and "chronic depression." We note that as Plaintiff submits, that same nurse practitioner completed a functional capacity evaluation on February 11, 2004 which indicated that Plaintiff is restricted to one hour of sedentary activity in an eight hour workday, and can perform no light, medium or heavy activity in an eight hour workday. Additionally, in response to the question that asked, "Given your

38

knowledge of the medical factors impacting the patient's functional ability, at what point do you feel that there will be a significant change in functional ability," Ms. Sander responded, "unable to determine this.  Pt has not improved for 3 ½ years." (See Rec. Doc. 23, Ex. U).

We will now address the significant issue that Plaintiff raises concerning rejecting the opinions and diagnoses of Plaintiff's treating physicians and the application of two independent physicians, who as noted never examined Plaintiff but believe that she is not disabled based on a review of her file.  Defendants accurately submit that the Supreme Court has held that the "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).  Although the Supreme Court has held that courts may not require ERISA plan administrators to defer to doctors who have treated a claimant over those who merely review her medical files, the court may still evaluate the weight of each doctor's opinion on the extent of his or her treatment history with the patient and specialization or lack thereof.  Id. at 832; see also Brown, 348 F.Supp.2d at 368, n.9.

We are in agreement with other courts that have determined that direct contact with a patient over an extended period of time is especially important for reliable evaluation of a disease as subjective and variable as fibromyalgia, as it can allow for a more thorough examination of the patient's credibility and true range of abilities. See id. at 368. Although Unum's denial letter states that "there is no evidence to support that you are disabled due to Fibromyalgia" and that "They noted while Fibromyalgia has been provided as a diagnosis the file lacks an examination by which the diagnosis is typically made," Dr. Ellis, Plaintiff's primary care physician, treated Plaintiff for several years, and his fibromyalgia diagnosis was corroborated by three specialists who all examined Plaintiff, a board-certified rheumatologist, a neurologist, and a pain management specialist.

Additionally, Dr. Ellis and Dr. Calvert, Plaintiff's psychiatrist, specifically address Plaintiff's ability to work. First, Dr. Ellis extensively addressed the subject as we previously mentioned and concluded that Plaintiff's condition would be worsened by any gainful employment, including a full-time sedentary position, although we note that Defendants argue his opinion lacks an explanation as to why Plaintiff is unable to perform gainful employment. Second, after having seen Plaintiff for approximately one year, in her April 24, 2003 letter to Plaintiff's counsel, Dr. Calvert stated that she has no hesitation in saying that Plaintiff could

40

not possibly manage to work a full-time job in any field, and even a part-time job would not be feasible.  Dr. Calvert also noted that Plaintiff does not appear to be embellishing her symptoms for some secondary gain.  (See Rec. Doc. 23, Ex. M).

In contrast to the above referenced physicians who examined and treated the Plaintiff, Defendants admit that Doctors Schmidt and Randall never examined Plaintiff in person.  Defendants argue however, that Unum considered the opinions and diagnoses of Plaintiff's physicians and found that the information contained in their records supported a finding that Plaintiff did not meet the definition of total disability under the Plan or had exhausted her entitlement to psychiatric benefits.

Both Dr. Schmidt and Dr. Randall concluded that there was not evidence to support that Plaintiff was disabled due to fibromyalgia and it appears that they also concluded that Plaintiff did not suffer from fibromyalgia, despite the repeated diagnosis from her treating physicians.  To the extent that Unum relied upon Plaintiff's lack of "objective evidence" of "physical functional capacity," or that her symptoms were "more subjective in nature," which all formed a basis for Dr. Schmidt's opinion, such arguments are unconvincing in light of fibromyalgia's essentially subjective nature.  The previously cited case which arose in the Eastern District of Pennsylvania explained that even if an ERISA administrator may sometimes impose a requirement for "objective" medical evidence, that does not

41

appear explicitly in a plan's terms, it would be unreasonable to do so here.  <u>Brown</u>, 348 F.Supp.2d at 369.  "Such a requirement would effectively preclude any fibromyalgia patient from qualifying as totally disabled on the basis of the disease."  <u>Id.</u>  Moreover, the Third Circuit Court of Appeals has found it arbitrary and capricious – not merely misguided – to require objective evidence of diseases for which such evidence is simply unavailable.  <u>Mitchell</u>, 113 F.3d 442-43 (reversing administrator's denial of disability benefits to chronic fatigue patient as arbitrary and capricious).  Finally, because objective tests may not be able to verify a diagnosis of fibromyalgia, the reports of treating physicians, as well as the testimony of the claimant, become even more important in the calculus for making a disability determination.  <u>See</u>, <u>e.g.</u>, <u>Perl v. Barnhart</u>, 2005 U.S. Dist. LEXIS 3776, *10 (E.D. Pa. 2005); <u>Green-Younger</u>, 335 F.3d at 108 (reversible error when ALJ discredits claimant's subjective testimony and opinion of treating physicians in favor of "objective" evidence of fibromyalgia, a disease "that eludes such measurement").

Although generally independent medical examinations are not required, in the case <u>sub judice</u>, the utilization by Defendants of two physicians who never examined Plaintiff, but simply refused to accept the fibromyalgia diagnosis and thus rejected disability due to fibromyalgia on the basis of Plaintiff's medical file,

was arbitrary and capricious given the fact that Plaintiff's primary care physician made the diagnosis, which was corroborated by three examining specialists and not subsequently altered in any way.[6]

After carefully considering the record as it was before the Plan Administrator at the time the decision to deny Plaintiff's LTD benefits was made, the Court finds that the assessments of Plaintiff's treating sources established the severity of her fibromyalgia and the limitations that such disease posed on Plaintiff's capacity to engage in substantial gainful employment. The Plan Administrator's decision to deny Plaintiff LTD benefits was not supported by substantial evidence in the record, and without substituting the Court's judgment for that of the Defendants in determining eligibility for plan benefits, the Court concludes that Plaintiff is "totally disabled" under the terms of the Plan and entitled to receive LTD benefits from Defendants.[7]  See Johnson, 2005 U.S. App.

---

[6] We recognize that fibromyalgia and its diagnosis are controversial areas in both law and medicine.  Moreover, we do not mean to say that a plan administrator will never have a basis to question a diagnosis of fibromyalgia because of its subjective aspects.  However, given the nature of fibromyalgia we conclude, as the court did in Brown, that a plan administrator's insistence that objective evidence concerning fibromyalgia be provided may be an impossible burden upon the patient.  It appears to us that the better practice is to have a hands on independent examination of the patient, rather than a detached review of medical records.

[7] We note that the vocational assessment conducted by Ellie J. Ettner, at Unum's direction, which concluded that three jobs existed within Plaintiff's restrictions that would permit her to earn a salary above that which she collected in LTD benefit payments is equally flawed as it utilized the restrictions and limitations as determined by Dr. Randall, who never examined Plaintiff as previously addressed, as opposed to the criterion provided by Plaintiff's

LEXIS 2115, at *8-9; see also Orvosh, 222 F.3d at 129.  We therefore find that Plaintiff has been unable "to perform any and every duty of any gainful occupation for which [s]he is reasonably fitted by training, education or experience."[8]

Under ERISA § 502(a)(1)(B), Plaintiff may recover the monthly disability benefits she has not received since Unum terminated her benefits on November 2, 2002.[9]  We therefore direct the parties to submit detailed calculations of Plaintiff's total damages from November 2, 2002, through May 30, 2005.  Plaintiff also seeks attorney's fees and prejudgment interest on her back benefits.  The Court will consider those matters further on submission of a detailed petition setting forth the reasons justifying such an award and a calculation of the specific amounts sought.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1.      Plaintiff's Motion for Summary Judgment (doc. 19) is GRANTED.

2.      Defendants shall reinstate Plaintiff's long-term disability benefits as

         of November 2, 2002, subject to the terms and conditions of the

---

treating physicians.

[8] We reiterate that we need not reach Plaintiff's argument that Defendants are bound by the actions of MetLife, even though MetLife is not a party to this action.

[9] We recognize that Unum began paying Plaintiff monthly benefits under a "Reservation of Rights" from January 1, 2004 until June 31, 2004 and that Plaintiff received a fully favorable decision of her Social Security Disability claim on July 8, 2004, which may have an impact on Plaintiff's total damages.

disability insurance policy.

3.      Both parties shall have thirty (30) days from the date of this Order to

submit detailed calculations of Plaintiff's total damages from

November 2, 2002 through May 30, 2005.

4.      Plaintiff shall have thirty (30) days from the date of this Order to file a

petition for prejudgment interest, and for attorney's fees and costs.

5.      Defendants' Motion for Summary Judgment (doc. 20) is DENIED.


                                    s/ John E. Jones III
                                    John E. Jones III
                                    United States District Judge